## BEAL & Co. v. STEVENS.

**Draft:** PRESUMPTION AS TO OWNERSHIP. Defendant was a banker, and, as such, held a note made by H. as principal and B. as surety, payable to C. H. was unable to pay it when due, and the firm of B. & Co. drew a draft "per B.," payable to defendant's order, and gave it to H. with which to pay the note. By this time defendant had severed his connection with the bank, but he indorsed the draft and assumed control of the proceeds, though he knew that they were intended to pay the note. Afterwards, on request of H., he paid the money to him. *Held* that there was nothing to indicate to defendant that H. had not paid for the draft and that he was not entitled to the money, but the contrary, and that, as defendant was charged with no duty as to the note, he was not liable to B. & Co. for the money.

*Appeal from Tama District Court.*—HON. G. M. GILCHRIST, Judge.

FILED, JANUARY 22, 1890.

"THE facts, as shown by the record, are that L. G. Beal, one of the plaintiffs, was surety on a note of some eighty dollars for J. S. Hunter, and payable to Crofutt. The principal not being able to pay, Mr. Beal, who resides at Gilman, drew his draft on Everingham & Co., payable to the order of C. J. Stevens, the defendant, and sent it by Hunter to the Montour Exchange Bank, where defendant was supposed to be. The defendant was not there, but the next day or two he indorsed the draft, and ordered it paid to his brother, H. J. Stevens, who, he supposed, held the note. This was about September 11, 1883. Long after this, about May 1, 1886, he gave his receipt for the money, as follows:

" 'Received of J. S. Hunter, by Geo. D. Young, eighty-eight dollars, September 12, 1883, to apply on a note of J. S. Hunter and L. G. Beal to C. B. Crofutt, payable at Montour Exchange Bank.

" 'C. J. STEVENS.'

"About June 17, 1886, or a month and a half after executing the receipt above given, the defendant, on request of Hunter, paid, or caused to be paid, the said money to him. That defendant knew at all times the object of the draft, what it was sent there for, and that Beal was surety only on the note, is undisputed. He was also charged with the knowledge that it was Beal's money, as it came to him in the form of a draft drawn by plaintiff. These facts, we think, are substantially agreed upon." The foregoing is appellants' statement of facts, as copied from their brief, and, for the purpose of this trial, may be accepted, except as to the legal conclusion that, by the draft, defendant "was charged with knowledge that it was Beal's money." It should further be stated that at no time before the payment of

the money to Hunter had defendant any knowledge of who owned the draft, except such knowledge as the draft itself imparted, and that Hunter delivered it at the Montour Exchange Bank for him. Upon this state of facts the district court entered judgment for defendant, and plaintiffs appeal.

*J. H. Bradley* and *J. L. Carney*, for appellants.

*Struble & Stiger*, for appellee.

GRANGER, J.—The defendant was evidently made payee of the draft in question, because the note was made payable at the bank of which he was then a proprietor. After the making of the note, but without knowledge to the makers, he had dissolved his connections with the bank, and was not at the bank when the draft was left there, and was under no obligation to assume any duties in reference to it. He did, however, indorse the draft, to enable the bank to convert it into money, and assumed control of the money. Under such circumstances, he could do one of two things: *First*, apply the money in payment of the note; or, *second*, return it to the person whom he had a legal duty to believe owned it. This proposition will hardly be questioned. The money was not applied in payment of the note, and was paid to Hunter; and the query is thus presented, had he a legal right to believe Hunter was the owner of the draft? Appellant attaches much importance to the fact that the draft was drawn by plaintiff to defendant, and that Hunter was not a party to it, in the sense of his name being on the paper. Hunter's only connection with the draft is the fact that he was the custodian for its delivery to defendant. He was also a co-obligor for the payment of the note. His co-obligor was not the plaintiff company, but a member of it,—L. G. Beal. The draft is in these words:

"$88.   L. G. Beal & Bros., Dealers in Grain and Live-Stock :

"Pay to the order of Chauncey Stevens eighty-eight dollars.                    N. S. BEAL & Co.

"Per L. G. BEAL.

"*To L. Everingham & Co., Chicago, Ill.*"

From these facts, what was there to indicate to defendant that L. G. Beal owned or sent the draft to him? His name is there only as having acted for the firm in its issuance, just as it might have appeared if Hunter had bought and paid for the draft. It may aid our reasoning if we slightly change the facts. Suppose Hunter had obtained the draft from a bank entirely disconnected from the note transaction, and, in so doing, had caused the name of the defendant to be inserted as payee, and had himself delivered it, as in this case, for the payment of the note of which he is a joint maker. Who would defendant have a legal right to assume owned the draft? There seems hardly room for a difference of opinion. He certainly might assume that the parties making the draft had received pay for it. Such is the usual course of business. In what respect do the facts of this case differ? Only to the extent that L. G. Beal, who is a joint maker of the note, and a surety, is a member of the firm who issued the draft. There is nothing to indicate that L. G. Beal sent the draft, or had any interest therein other than as a member of the firm that drew it and was responsible for its payment. Hunter had the custody of a draft drawn by the firm not a maker of the note, and was seeking to apply it for the discharge of a debt, for which he was primarily liable. The defendant knew of this primary liability; and, in view of the facts, was he not better justified in the belief that Hunter procured the draft to pay his debt than that he held it for Beal, whose obligation was secondary? We think so, and that he violated no trust in paying the money to Hunter.

AFFIRMED.